IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 21-CR-160-5 (TJK) |
| | : | |
| v. | : | 18 U.S.C. §§ 1512(c)(2), 2 |
| | : | 18 U.S.C. § 115(a)(1)(B) |
| WILLIAM CHRESTMAN, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, William Chrestman, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday,

November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5. Shortly before 1:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials. The riot resulted in

substantial damage to the Capitol, requiring the expenditure of more than $2.8 million dollars for repairs.

7.     Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### The Defendant's Participation in the January 6, 2021, Capitol Riot

8.     As of January of 2021, defendant William Chrestman was a second-degree member of the Proud Boys, in the organization's Kansas City chapter. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group.

9.     Beginning in or around December of 2020, the defendant and other members and associates of the Kansas City Proud Boys, including co-defendants Christopher Kuehne, Ryan Ashlock, and Louis Enrique Colon, began making plans to travel to Washington, D.C. to, among

other things, show their support for then-President Trump and protest Congress' certification of the Electoral College vote.

10.    To coordinate their trip, individuals in the group sent electronic communications to each other which included discussions about engaging in violence with "Antifa" and Black Lives Matters supporters, obtaining/bringing two-way radios, medical supplies, weapons, and other equipment, and concealing their identities. Among other messages, the defendant asked about firearms and other weapons: "What are the rules on this? No 2A [Second Amendment, i.e., firearms], correct? We bringing flags? Armed in any way? Body armour?" Upon being advised that firearms could not be carried in Washington, D.C., the defendant replied, "Ok….. 😢 But wood flag staffs are cool!?"

11.    From January 4-5, the defendant drove from the Kansas City area to the Washington, D.C. metro area. On January 5, he arrived at a house in Arlington, Virginia that had been rented by members of the Kansas City Proud Boys group. The defendant referred to this location as the "safe house." On the evening of January 5, the defendant and others held a meeting at the house.

12.    In the early morning on January 6, 2021, the defendant, along with co-defendants Kuehne, Colon, and Ashlock, and others, traveled from Arlington, Virginia, to Washington, D.C., where they met with a large group of Proud Boys at the Washington Monument. Along the way, co-defendants Felicia Konold and Cory Konold joined their group. The defendant was wearing a tactical vest and protective gloves, and he carried with him a gas mask and a wooden axe handle with a flag attached to it.

13.    After joining with the large group of Proud Boys, the defendant marched with them in the street near the U.S. Capitol while shouting, among other things, "Whose streets? Our

streets." The defendant and the group ultimately made their way to the west side of the Capitol's grounds, outside of the restricted, fenced-off perimeter made up of barricades guarded by uniformed USCP officers. The defendant, the Proud Boys group, and other individuals gathered outside the barricades where they took part in chants including "Whose Capitol? Our Capitol." As the defendant later explained in a recorded phone call, he understood that the group went to the Capitol because they had learned that "our piece of shit Vice President Pence was gonna cuck under and not do the right thing with the votes."

14.     Shortly before 1:00 p.m., members of the crowd breached the line of barriers and surged toward the Capitol building. The defendant, along with other Proud Boys he had been marching with, moved forward as part of the crowd during this initial breach. The force of their combined numbers caused the USCP officers stationed at the barricades to run for safety, allowing the crowd to move past multiple lines of barricades and ultimately make its way onto the Capitol's Lower West Plaza, inside the restricted area. The defendant moved to the front of the crowd, where he encouraged other rioters by waving them forward and shouting "Go! Go! Go!" After arriving at the front of the crowd, upon seeing officers attempting to arrest an unruly rioter, the defendant yelled, "Don't let them take him!"

15.     For more than one hour, the defendant remained on the west front of the Capitol. Throughout that time, USCP officers (eventually joined by D.C. Metropolitan Police Department officers) tried unsuccessfully to control the crowd and expel it from the restricted area by, among other things, giving verbal orders to disperse, forming police lines, and deploying crowd-control measures including less-lethal munitions.

16.     Notwithstanding these police actions, the defendant failed to leave the area. Instead, the defendant remained unlawfully on the restricted Capitol grounds and, as time went on,

made his way closer to the Capitol building, which officers were attempting to defend. For much of this time, the defendant remained at the front of the crowd. He recorded videos of himself there, including one where he bragged about having "stormed the Capitol" and "taking our country back." He also stated, "The cops know we have them... We could take this shit in a heartbeat." From the front of the crowd, the defendant led other rioters in a call-and response: "Whose country is this!? – *Our country!* – Whose house is this!? – *Our house!* – Do you want your house back!? – *Yeah!* – Take it!"

17.     While positioned at the front of the crowd, the defendant was standing directly next to a line of USCP officers who were attempting to hold a perimeter that would prevent members of the crowd from advancing further toward the Capitol building. Behind that police line, from an elevated position, other USCP officers were firing less-lethal "pepper-ball" rounds at specific agitators in the crowd who were physically engaging with police. The defendant pointed his finger at the officers armed with less-lethal munitions, gestured toward them with his axe handle, and shouted in their direction, "Hey, if you shoot I'll fucking take your ass out." When the defendant shouted this, he was standing several feet away from multiple USCP officers.

18.     Eventually, the defendant reached the base of the Capitol building and made his way onto the Upper West Terrace. By then, members of the crowd had forcibly breached the building by breaking windows next to the Senate Wing Door, climbing through the windowpanes, and opening the door from the inside. Numerous members of the crowd began funneling into the building, including the defendant, who entered through the Senate Wing Door, next to the broken windows, at approximately 2:25 p.m., roughly twelve minutes after the initial breach. Upon entering the defendant again led other rioters in a chant: "Whose house!? *Our house!*"

19.     Once inside, the defendant and others, including co-defendants Kuehne, Colon, Felicia Konold, and Cory Konold, moved about the building and made their way to the Crypt. Several USCP officers in that area, badly outnumbered by members of the crowd, began running away and positioned themselves on the opposite side of a large, sliding-door style metal barrier that was being lowered from overhead.   Members of the crowd pursued the officers and successfully stopped the door from closing by placing chairs and a trash can in its path.  Within view of the defendant, who was several feet away, police attempted to close the door and repel the rioters, who were throwing objects and spraying chemical irritants at police.  Ultimately the rioters prevailed, and the officers retreated further into the building.

20.     After the officers had fled, the defendant and other Proud Boys members he had traveled with — including co-defendants Kuehne and Colon — took steps to ensure the metal door would remain open, thereby preserving the crowd's ability to move unlawfully about the building. As the door was rising, the defendant pressed up on it with his axe handle.  Then, while Kuehne and another individual were moving a lectern into the path of the sliding door, where it would block the door from closing, the defendant moved a smaller chair out of the way to make room for the lectern.  In a subsequent recorded phone call, the defendant described this episode as follows: "We had the cops running through the fucking State Building [*sic*], dude, trying to slam the emergency doors, like, the big garage door-type ones that segregate off the rooms, and we were throwing fucking chairs under there to block it dude, to keep going down... The cops were legitimately scared for their fucking lives."

21.     After successfully obstructing the barrier, the defendant and others progressed into the Capitol Visitor Center.  At that location, an altercation broke out between USCP officers and an individual they were attempting to arrest.  The defendant grabbed onto the individual and pulled

on him, after which the individual broke free from the grasp of police and escaped arrest.  A short time later, the defendant returned to the Senate Wing Door and left the building.

22.     Because of the unauthorized presence of the defendant and others in the building, the certification proceeding was halted and could not resume until late in the evening of January 6.  As the defendant later explained in a recorded phone call: "We stormed the Capitol Building and we took it over... We made the House [of Representatives] leave. Like, they couldn't finish their vote."

*Elements of the Offenses*

23.     The parties agree that obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), requires the following elements:

   a.   The defendant attempted to or did obstruct or impede an official proceeding.

   b.   The defendant intended to obstruct or impede the official proceeding.

   c.   The defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding.

   d.   The defendant acted corruptly.

24.     The parties agree that threatening a federal officer, in violation of 18 U.S.C. § 115(a)(1)(B), requires the following elements:

   a.   The defendant threatened to assault a federal law enforcement officer; and

   b.   The defendant did so with intent to impede, intimidate, and interfere with such law enforcement officer while such officer was engaged in the performance of official duties.

For purposes of this offense, a statement is a "true threat" if a reasonable person would foresee its interpretation by others as a serious expression of intent to harm or assault.

### Defendant's Acknowledgments

25.     The defendant knowingly and voluntarily admits to all the elements as set forth

above.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     *s/ Conor Mulroe*
CONOR MULROE
Special Assistant U.S. Attorney
1301 New York Ave. NW
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, William Chrestman, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 10/16/23

William Chrestman
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 10/16/23

Michael J. Cronkright
Attorney for Defendant

Edward R. MARTIN, JR.