**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-160 (TJK)** |
| **WILLIAM CHRESTMAN** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Chrestman to 63 months' incarceration, which represents the top end of the guideline range stipulated to by the parties in their plea agreement, the statutory maximum term of 36 months' supervised release, a mandatory assessment of $200, and $2,000 restitution.

## I.      INTRODUCTION

The defendant, William Chrestman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Chrestman, a second-degree member of the Proud Boys, coordinated with other members of the organization to participate in the riot. On January 6, Chrestman led a group of his co-defendants up to the secured perimeter around the Capitol. After a group of rioters breached through the police barricade, Chrestman, brandishing a two-foot-long axe handle, quickly moved to the front of the rioters who were pursuing the retreating officers. Once police officers were able to briefly stop the rioters, Chrestman continued to encourage other rioters forward and then urged them to stop the arrest of another rioter. Later, while standing in front of another police line, Chrestman threatened officers with violence and rallied rioters to take back "your house." Once inside the Capitol, Chrestman helped to stop a security barrier from closing, which allowed rioters to move past the barrier and chase retreating officers. While officers confronted Chrestman and other rioters inside the Capitol Visitor Center, Chrestman prevented the arrest of yet another rioter. As he later bragged, Chrestman took all of these actions with the intent of stopping Congress' certification of the Electoral College vote for the 2020 presidential election.

The government recommends that the Court sentence Chrestman to 63 months of incarceration, which reflects the gravity of Chrestman's conduct.

## II.      FACTUAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 202, for a short summary of the January 6, 2021 attack on the United States Capitol by

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hundreds of rioters in an effort to disrupt the peaceful transfer of Presidential power after the November 3, 2020 election.

### B.     William Chrestman's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Communications*

Beginning in or around December 2020, Chrestman and other members of the Kansas City Proud Boys made plans to travel to Washington, D.C. to protest Congress' certification of the Electoral College vote. During those conversations, other members eagerly discussed their expectations of violence at the event, and Chrestman tried to figure out whether he could bring any weapons to the protest. When he learned he couldn't bring a firearm, he sent a frowning face emoji and settled for a "wood flag staff[]."

#### *Approach to the Capitol*

On January 6, 2021, Chrestman traveled with his co-defendants from their lodgings in Virginia to Washington, D.C. Once in the District, they met with a large group of Proud Boys members at the Washington Monument. Chrestman and the others then began marching towards the Capitol. Chrestman was wearing a tactical-style vest, camo pants, brown gloves with knuckle guards, and held an approximately two-foot-long wooden axe handle with an American flag wrapped around it. Figure 1; *see also* Gov't Ex. 1 at 0:15-0:19. Chrestman purchased this axe handle the day before the riot and used the American flag as a way of disguising the fact that it was a weapon. In addition, Chrestman had a helmet attached to his pants with a strip of orange duct tape affixed to it. Many Proud Boys members wore this duct tape on their clothes to identify

themselves and to stay close to one another.



*Figure 1: Chrestman (right) marching with a large group of Proud Boys*

Once they reached the perimeter of the Capitol, at an area known as the Peace Circle, the group's path was blocked by United States Capitol Police ("USCP") officers standing behind bicycle rack barricades and fencing. Rather that stopping at this barricade, however, members of the group decided to push forward. When Chrestman saw the first rioters pushing against the officers, he rushed to join them, bringing with him co-defendants Felicia Konold and Cory Konold. Gov't Ex. 8 at 0:11. Chrestman made his way to the very front of the group of rioters who were directly confronting the police line. Gov't Ex. 8 at 0:22. Chrestman and the other rioters then pushed over and dismantled the barricade, creating the first breach of the restricted perimeter around the U.S. Capitol Building. Figure 2. The officers standing behind the barricade then

retreated to the West Front of the Capitol followed by rioters who ran towards them.



*Figure 2: Chrestman (circled in red) pushing down the barricade at the Peace Circle*

At the West Front, the officers scrambled to respond to the overwhelming number of rioters in front of them. While the officers verbally ordered the rioters to turn around, Chrestman turned towards the crowd behind him and waved them forward. Figure 3; Gov't Ex. 4 at 2:13. About one minute later, the officers had retreated behind a fence and arrested one of the rioters. Upon seeing the detained rioter, Chrestman got the attention of nearby rioters and told them, "Don't let them take him." Figure 4; Gov't Ex. 4 at 3:44-4:03. Shortly afterwards, the rioters again breached through the police line. Gov't Ex. 4 at 4:33.



*Figure 3: Chrestman (center) trying to bring more rioters forward*



*Figure 4: Chrestman attempting to prevent the arrest of another rioter*

Eventually, USCP officers were reinforced by a large number of Metropolitan Police Department ("MPD") officers who set up another line of defense behind another set of bicycle rack barricades. Due to the overwhelming number of rioters, the officers began to use less-lethal munitions in an attempt to disperse the crowd. In response to seeing the officers with these munitions, Chrestman pointed his axe handle at several of them and said, "Hey, if you shoot I'll fucking take your ass out." Figure 5; Gov't Ex. 2. Chrestman also rallied the rioters along the West

Front. At one point, he turned to the rioters and led them in a call-and-response: "Whose country is this!? – *Our country!* – Whose house is this!? – *Our house!* – Do you want your house back!? – *Yeah!* – Take it!" Figure 6; Gov't Ex. 3.



*Figure 5: Chrestman (right) pointing an axe handle at officers while verbally threatening them*



*Figure 6: Chrestman (center) rallying rioters while officers push him away from their line*

As the rioting on the west front continued, the anger of the crowd intensified, and a physical struggle broke out as rioters tried to shove the barricades against the outnumbered officers who were attempting to resist. Chrestman participated vigorously in that struggle. Although the quality

of the video recorded by a live steamer is poor, he and the Konolds can be seen in Exhibit 10 pushing against bike racks that have been lifted from the ground; Chrestman heaves with his shoulder as he and the other rioters try to overpower the officers holding the line on the other side of the barricade. In another angle of this time period, Chrestman can clearly be seen wearing a gas mask while threateningly pointing his axe handle at officers. Figure 8.



*Figure 7: Chrestman (circled) and Konolds shoving against barricades*



*Figure 8: Chrestman (circled in red) wearing a gas mask while holding his axe handle*

**Breach of the Capitol Building and Chrestman's Entry into the Capitol**

Despite police efforts, rioters eventually breached through their barricades, which blocked access to the Upper West Terrace. Chrestman passed through that breach to reach the plaza outside of the Senate Wing Door.

Surrounded closely by other rioters, and with the Konold siblings in tow, Chrestman climbed the stairs toward the building. As he did, he continued to incite other members of the crowd, shouting slogans like "Whose house!? [*our house!*]…Take your house!" Gov't Ex. 9 at 0:50-0:59. He also boasted about his role in the initial breach at Peace Circle: "We were the ones in front." *Id.* at 0:10-0:13. Chrestman made clear that he considered himself and the other members of his group as the leaders of the day's events. He repeatedly expressed his appreciation to those around him, whose participation he regarded as secondary: "Thank you guys. Thank you for helping us," *id.* at 01:30 – 01:33, and "Thank you guys for helping us. Proud Boys. Thank you." *Id.* at 02:52 – 02:56.

As Chrestman was ascending the stairs, other rioters broke in the windows adjacent to the Senate Wing Door to gain entry into the Capitol. Chrestman followed shortly behind, entering the Capitol at 2:25 p.m. Figure 7. Once inside, Chrestman led another call-and-response: "Whose house? – *Our house!*" Gov't Ex. 5 at 0:12-0:15.



*Figure 7: Chrestman (circled in red) breaching into the Capitol while filming with his phone*

Chrestman then followed the crowd into the Crypt where a group of rioters overwhelmed a group of USCP officers who retreated towards the Capitol Visitor Center ("CVC"). To protect their withdrawal, the officers attempted to lower a set of sliding-style metal barriers, which would have closed off the CVC from the Crypt. But Chrestman and the other rioters, including other Proud Boys with whom he had traveled from the Kansas City area, stopped the barriers from closing by holding them open. Figure 8; Gov't Ex. 6 at 0:36.



*Figure 8: Chrestman (circled in red) using his axe handle to stop the barriers from closing*

During a telephone call that Chrestman recorded, he bragged about his interference with the police: "[W]e had the cops running through the fucking State Building, dude, trying to slam the emergency doors, like, the big garage door-type ones that segregate off the rooms, and we were throwing fucking chairs under there to block it dude, to keep going down, dude, and there was so much CS gas in there and shit, dude and—like—dude, the cops were legitimately scared for their fucking lives."

Rioters then pursued the officers into the CVC where another confrontation between rioters and USCP began. As officers attempted to detain one rioter on the ground, Chrestman walked into the fray while still carrying his axe handle. Figure 9; Gov't Ex. 7 at 5:44. Chrestman spent several minutes in this area talking with both rioters and police officers before he prevented the arrest of another rioter. After approximately six minutes in the CVC, Chrestman returned to the Capitol building with the other rioters. Chrestman exited the Capitol through the Senate Wing Door at 2:51 p.m., approximately 26 minutes after entering. Figure 10.



*Figure 9: Chrestman (circled in red) approaching officers physically engaged with rioters*



*Figure 10: Chrestman (circled in red) exiting the U.S. Capitol*

### *Chrestman's Statements*

In recorded telephone calls [2] he made after the riot to his daughter and to a male acquaintance, Chrestman discussed his reasons for going to the Capitol on January 6. In one call, he said that he understood that the Proud Boys went to the Capitol because they had learned that "our piece of shit Vice President Pence was gonna cuck under and not do the right thing with the

---

[2] The recordings were found on Chrestman's phone after it was recovered by law enforcement.

votes." Chrestman also said, "We stormed the Capitol Building and we took it over . . . We made the House [of Representatives] leave. Like, they couldn't finish their vote."

## III.     THE CHARGES AND PLEA AGREEMENT

On January 12, 2022, a federal grand jury returned a superseding indictment charging Chrestman with six counts, including, conspiracy, in violation of 18 U.S.C. § 371, obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), civil disorder, in violation of 18 U.S.C. § 231(a)(3), threatening a federal officer, in violation of 18 U.S.C. § 115(a)(1)(B), entering or remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), and disorderly conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A). On October 16, 2023, Chrestman pleaded guilty, pursuant to a plea agreement, of obstruction of an official proceeding and threatening a federal officer.

## IV.     STATUTORY PENALTIES

Chrestman now faces sentencing on those offenses. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, PSR ¶ 19, for the offense of obstructing an official proceeding, Chrestman faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. For the offense of threatening a federal officer, Chrestman faces up to six years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---|
| U.S.S.G. §2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. §2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| U.S.S.G. §2J1.2(b)(3) | Scope, Planning, or Preparation | +2 |
| | **Total** | **27** |

This Court thoroughly evaluated the advisory Sentencing Guidelines and Specific Offense Characteristics when sentencing other members of the Proud Boys. *See, e.g.*, *United States v. Joseph Biggs*, 21-cr-175 (TJK), Sent. Hr'g Tr. (Aug. 31, 2023). Following extensive briefing and argument during a series of contested hearings, this Court applied all of the Specific Offense Characteristics listed above when considering similar conduct of individuals who marched to the Capitol and stormed the grounds and buildings with Chrestman. *See, e.g.*, *id.* at 17:16-25:17 (Aug. 31, 2023) (application of 2J1.2(b)(1)(B), (b)(2), (b)(3)(C)). The Specific Offense Characteristics are also correctly applied here.

First, Section 2J1.2(b)(1)(B) applies where a defendant directly caused injury, threatened injury, or damaged property. This enhancement plainly applies based upon the defendant's own conduct here. See U.S.S.G. §1B1.3(a)(1)(A). To begin, Chrestman joined with a large of group of rioters to tear down the bicycle rack barricade adjacent to the Peace Circle, which kickstarted the events on and violence of January 6. Chrestman threatened several police officers with violence if they used crowd control measures against the rioters; a threat he acted upon when he and the

Konolds pushed against a barricade on the West Plaza. But that's not all. The relevant conduct provisions of U.S.S.G. §1B1.3(a)(1)(B) also encompass the acts and omissions of other members of a jointly undertaken criminal plan, scheme, endeavor, or enterprise so long as those actions are (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity. Twice during the riot, Chrestman either encouraged other rioters to stop, or he himself stopped, the arrests of detained rioters by force. Even if these efforts did not cause physical injury, they certainly involved the threat of physical injury. Thus, those threats were reasonably foreseeable to Chrestman and within the scope of the criminal endeavor, which brings such conduct with the scope of "relevant conduct" for sentencing.

Second, Section 2J1.2(b)(2) applies where "[t]he offense resulted in substantial interference with the administration of justice." The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." See U.S.S.G. §2J1.2(b)(2), Application Note 1. Chrestman was found guilty of corruptly obstructing and impeding an official proceeding, namely the Congressional certification of the Electoral College vote count, and he admitted as much in the Joint Statement of Offense. ECF 202. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

Finally, Section 2J1.2(b)(3)(C) applies "[i]f the offense . . . was otherwise extensive in scope, planning, or preparation." Chrestman's relevant conduct shows that his offense was

extensive in scope, planning, and preparation. In the lead up to the riot, Chrestman communicated with other Proud Boys to determine what kind of weapons he could carry within Washington, D.C and then purchased such a weapon the day before the riot. On January 6, he came prepared for violence, wearing a tactical vest and gloves with knuckle guards. He also had a gas mask with him, which he put on when police officers on the West Plaza began deploying chemical irritant to disperse the crowd. Chrestman and his other Proud Boys made sure to wear strips of orange duct tape on their clothing to ensure maximum cohesion, and thus effectiveness of any joint action, of the group. These acts all indicate a premeditated commitment to use violence to achieve the objective of stopping Congress's certification of the Electoral College vote.

With respect to Count Four, the parties agree that the Guidelines for Count Four is as follows:

Count Four: 18 U.S.C. § 115[3]

| | | |
|---|---|---|
| U.S.S.G. §2A6.1(a)(1) | Base Offense Level | 12 |
| U.S.S.G. §2A6.1(b)(5) | Substantial risk of inciting others | +2 |
| | **Total** | **14** |

Section 2A6.1(b)(5) applies "[i]f the defendant (A) is convicted under 18 U.S.C. § 115, (B) made a public threatening communication, and (C) knew or should have known that the public threatening communication created a substantial risk of inciting others to violate 18 U.S.C. § 115." Subpart A is satisfied as Chrestman was convicted of this offense. Subpart B is also satisfied

---

[3] In the plea agreement, the government indicated that it would seek an enhancement on the offense of threatening a federal officer for conduct evidencing an intent to carry out the threat under U.S.S.G. §2A6.1(b)(1). Plea Agreement at ¶ 4(A). Upon further consideration, however, the government no longer intends to seek this enhancement. Further, even if this enhancement applied, the offense groups with the offense of obstructing an official proceeding. PSR ¶ 66. The latter offense has a higher offense level and thus drives the Guidelines. PSR ¶ 67. Therefore, the enhancement would have no effect on the total offense level.

because Chrestman made the threatening statement in public, surrounded by hundreds of other rioters. The risk created by Chrestman's threat was obvious. Before he made the violent statement, Chrestman and others had already torn down a significant barricade, which restricted access to Capitol Grounds. Chrestman and the rioters then chased the nearby police officers down a walkway leading to the West Plaza. At the time when Chrestman made the threat, the rioters already vastly outnumbered the police officers guarding the Capitol. Thus, the rioters could, and did, use their numbers to completely overwhelm the police officers. Chrestman's threat only added fuel to the flames that would shortly overtake the U.S. Capitol.

*Grouping.* Under U.S.S.G. §3D1.2(c), a count that "embodies conduct that is treated as a specific offense characteristic in" another guideline groups with the guideline for that count. In Count Four, Chrestman was found guilty of threatening a federal officer. That conduct supports application of the specific offense characteristic in U.S.S.G. §2J1.2(b)(1)(B) of "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." The PSR correctly calculates that Counts Two and Four group. PSR ¶ 66. Accordingly, the total offense level is the highest offense level of the counts in the group, i.e., that for Obstruction of an Official Proceeding, see U.S.S.G. §3D1.3(a), and the combined offense level for these offenses is 27.

*Acceptance of Responsibility (U.S.S.G. §3E1.1).* Section 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Similarly, Section 3E1.1(b) provides for an additional one-level reduction in offense level in certain circumstances applicable here. In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the

conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3"—which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and all harm caused by those acts or omissions or was the object of those acts or omissions. U.S.S.G. §§1B1.3(a)(1)(A), 3E1.1 cmt. n.1(A). The government agrees that Chrestman is entitled to a three-level downward adjustment under U.S.S.G. §3E1.1(a) and (b) because he pleaded guilty pursuant to a plea agreement and did not contest the factual bases for his guilt for the two counts of conviction.

*Zero-Point Offender Reduction (U.S.S.G. §4C1.1)*. Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. §4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply here because Chrestman does not meet the additional criteria. Specifically, Chrestman used "credible threats of violence in connection with the offense." U.S.S.G. §4C1.1(a)(3). This conduct absolutely bars the application of Section 4C1.1. Thus, Chrestman is not entitled to any further reduction under this Guideline.

Further, the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g.*, *United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters

subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Chrestman's conduct and personal contribution to the violence of the day make him ineligible for the reduction available at Section 4C1.1.

*Criminal History Category*. The U.S. Probation Office calculated Chrestman's criminal history as Category I, which the government does not dispute. PSR ¶ 82.

*Advisory Sentencing Guidelines*. Based on the application of the Guidelines, Chrestman's properly calculated final offense level is 24 (i.e., Offense Level 27 less 3 points for acceptance). At Criminal History Category I and Offense Level 24, the advisory sentencing range is 51 to 63 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Chrestman's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Chrestman played a significant role during the riot due to his presence and conduct at pivotal moments during the day. Indeed, Chrestman regularly presented

himself as a leader among the rioters including when he was part of the tip of the spear that created the breach at the Peace Circle, encouraged other rioters to move to the police barricades, told rioters to stop the arrest of a rioter, and thanked them for supporting the Proud Boys. Chrestman also used various rallying cries both inside and outside of the Capitol the keep the rioters' motivations high. Lastly, Chrestman aided rioters' pursuit of police officers in the Capitol Visitor Center by preventing a security barrier from closing. The nature and circumstances of Chrestman's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 63 months' incarceration.

### B.  Chrestman's History and Characteristics

As described in paragraphs 89-98 of the presentence report, although Chrestman had difficulties in his upbringing, he was also "extremely close" relationships with his mother and brother. Chrestman also regularly attended school and activities such as a church youth group, little league baseball, and the Boy Scouts. His service in the U.S. Army is commendable on its own terms; however, in the context of this offense, Chrestman's military service means that he swore an oath to Constitution, and that he violated that oath by helping lead an attack on the government.

Chrestman's more recent circumstances are somewhat troubling in that they reveal a peer group that supported and encouraged his violent behavior on January 6. Chrestman came to Washington, D.C. with a group of "brothers" with whom he felt bonds of loyalty; those bonds led them to act together in committing a brazen offense against the rule of law. And apart from the Proud Boys, a series of phone calls Chrestman recorded after the riot show that he had others in his life who he considered supportive of his criminal conduct that day. For example, Chrestman

had a long conversation with his daughter in which he bragged about "storm[ing] the Capitol building," interfering with an arrest, and "start[ing] a revolution." He had a similar conversation with a man who appeared to be a friend, boasting about making the cops "legitimately scared for their fucking lives." As the Court considers Chrestman's social ties as part of its sentencing calculus, the Court should be aware that those ties did not prevent, and may have encouraged, the offenses of conviction.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Chrestman's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

Chrestman and his co-defendants engaged in acts that were intended to bring government to heel. Chrestman took these actions as part of a criminal collective. The Supreme Court has recognized that, "partnership in crime—presents a greater potential threat to the public than

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961). General deterrence is critical here for this reason. Any future actor who considers joining a criminal association to engage in political violence or exert its political will on the country must know that it will be taken seriously at sentencing.

***Specific Deterrence***

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a significant term of incarceration. In the aftermath of the riot, Chrestman was unrepentant for his actions. He lauded the fact that he chased police officers through the Capitol, striking fear into those people who merely showed up to work that day to do their job of defending the Capitol. He also celebrated that the riot accomplished its goal, namely impacting Congress' ability to certify the results of the 2020 presidential election, despite the long-lasting harm that the riot inflicted on the country. These boastful statements show that Chrestman believes in what he did that day and thus he must be deterred from similar, subsequent actions.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although there are many other defendants who participated in the Capitol breach on January 6, 2021, there remain many salient differences explain the differing recommendations and sentences. For Chrestman, unlike most January 6 defendants who acted individually, or in small family or friend groups, he and his fellow Proud Boys committed their crimes on January 6 as part of a large and cohesive unit. By assembling *en masse* and acting together, Chrestman and the others exponentially magnified the harm caused by the riot. Thus, Chrestman's offenses warrant a sentence comparable to other those of other defendants who were part of that unique group effort.

In *United States v. Daniel Lyons Scott*, 21-cr-292 (RCL), the defendant (nicknamed "Milkshake") was, like Chrestman, a rank-and-file member of the Proud Boys marching group who assumed a leadership role once the riot began. Scott rallied other Proud Boys to "take the fucking Capitol" while a group gathered at the Washington Monument. Scott also joined with others in a stack formation to rush forward at the Peace Circle breach. As the day progressed, Scott continued to work in concert with others, eventually causing the breach on the West Plaza that Chrestman later used to reach the Capitol Building. Immediately after this breach, Scott celebrated with those around him as rioters began to pour up towards the Capitol and around the remaining officers on the West Plaza. Judge Lamberth sentenced Scott to 60 months' incarceration. Scott's guilty plea mirrors Chrestman's, except Scott pled guilty to assaulting an officer while Chrestman

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

pled guilty to threatening an officer. Unlike Chrestman, however, Scott never entered the Capitol. Thus, Chrestman warrants a slightly higher sentence than the one imposed in *Scott*.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. No law enforcement officer suffered bodily injury as a result of Chrestman's threat. Nonetheless, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Chrestman must pay $2,000 in restitution, which reflects in part the role Chrestman played in the riot on January 6.[8] Plea Agreement at ¶ 11. As the

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. §3A1.2 cmt. n.1, the government or a governmental entity can be

plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Chrestman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 150.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 63 months' incarceration, 36 months' supervised release, $200 mandatory assessment, and $2,000 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Andrew S. Haag*
Andrew S. Haag
Assistant United States Attorney
MA Bar Number 705425
601 D Street NW
Washington, D.C. 20530
(202) 252-7755
andrew.haag@usdoj.gov

Conor Mulroe
Assistant United States Attorney
NY Bar Number 5289640
601 D Street NW
Washington, D.C. 20530
(202) 330-1788
conor.mulroe@usdoj.gov

---

a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Samantha R. Miller
Assistant United States Attorney
NY Bar Number 5342175
601 D Street NW
Washington, D.C. 20530
Samantha.Miller@usdoj.gov